## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

PEGGY SUE COVEY, )
)
Plaintiff, )
v. ) No. 1:17CV190 RLW
)
NANCY BERRYHILL, )
Acting Commissioner of Social Security, )
)
Defendant. )

## **MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) and 1383(c)(3) for judicial review of the

Commissioner of Social Security's final decision denying Plaintiff Peggy Sue Covey's

application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

("the Act") and for Supplemental Security Income ("SSI") under Title XVI of the Act. Because

the Appeals Council denied Plaintiff's Request for Review, the decision by the Administrative

Law Judge ("ALJ") is the final decision of the Commissioner. For the reasons set forth below,

the Court affirms the decision of the Commissioner.

### **I. Procedural History**

Plaintiff protectively filed an application for DIB and for SSI on February 24, 2014. (Tr.

341-45, 346-51) In both applications, she alleged disability beginning July 18, 2010. (Tr. 341,

346) Plaintiff subsequently amended the alleged onset date for her disability to April 26, 2013.[1]

(Tr. 366) Plaintiff's claims were denied on June 2, 2014 (Tr. 279-83), and she filed a request for

---

[1] Previously, Plaintiff had protectively filed an application for DIB and SSI on July 23, 2010 due to disability
beginning July 16, 2010. That claim was denied initially on December 13, 2010, and she filed a written request for a
hearing on December 27, 2010. After a video hearing was conducted on December 19, 2012, that ALJ issued a
decision on April 25, 2013 and determined Plaintiff was not disabled under the Act and denied benefits. (Tr. 225-
40) The Appeals Council denied her request for review on January 28, 2014. (Tr. 245-47) At the hearing for this
case, the ALJ explained that he only had jurisdiction since the previous ALJ's decision was issued. (Tr. 188-89)
Consequently and on the same date as the hearing, Plaintiff amended her onset date to the day after the previous
ALJ's decision. (Tr. 366, 223)

a hearing before an ALJ (Tr. 286-90). On May 17, 2016, Plaintiff testified at a hearing before the ALJ. (Tr. 184-224) In a decision dated August 2, 2016, the ALJ determined Plaintiff had not been under a disability from April 26, 2013 through the date of the decision. (Tr. 8-26) On September 11, 2017, the Appeals Council denied Plaintiff's request for review. (Tr. 1-4) The Appeals Council specifically noted it did not consider the additional medical evidence Plaintiff submitted because it found such evidence did not relate to the time period at issue. (Tr. 2) Accordingly, the Appeals Council found that Plaintiff's reasons and additional medical evidence did not provide a basis for changing the ALJ's decision. (Tr. 1) Thus, the ALJ's decision stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the May 17, 2016 hearing before the ALJ, Plaintiff appeared with counsel. Plaintiff testified she completed high school. She was recently divorced and lived by herself. Plaintiff has two children (22 and 18 years old). She had been on Medicaid off and on since 2006. The last day she worked was July 18, 2010. (Tr. 186, 189-91)

Plaintiff previously worked for a freight broker. Specifically, her job involved communicating with customers via phone and fax machine to help move freight on railroad trains across the country. This job did not involve much lifting, mainly paper. The freight broker job did not involve much walking but rather consisted mostly of sitting for "eight, nine hours a day." (Tr. 191-92) She left the freight broker job after she moved to find a new job closer to home. This job was as a transportation consultant, which was similar to her previous job. Plaintiff then worked as a pay day lender, primarily handling car loans and interviewing customers. This job required more standing than prior jobs (about half standing and half sitting)

- 2 -

because she worked at a counter with a register. Plaintiff worked at this job until she suffered a stroke in 2010. (Tr. 191-93)

Plaintiff testified that she experienced ongoing complaints related to her stroke. She began having migraines for which she sought medical treatment. She began taking home injections of medications which lessened the frequency of her migraines but she continues to experience them about once a week. Plaintiff said her migraines interfere with her ability to do activities of daily life. When a migraine starts, she has to go lay down in the dark for a little while or get the injections. Ibuprofen usually helps as well. She says it normally takes her about an hour-and-a-half to recover after a migraine. Plaintiff thinks stress causes the migraines. (Tr. 194-95, 199)

In addition to migraines, Plaintiff complained of what she called "flashers." She testified the sensation begins as a small flash of light that then moves in a circular pattern of multi-colored flashing lights that, on occasion, can persist for two hours. Her neurologist refers to this sensation as "visual disturbances" in medical records. She has experienced "flashers" consistently since 2010, initially about 10 times a month and now roughly 8 times a month, and they typically last 20-25 minutes. Plaintiff stated she does not take any specific medication related to the "flashers," rather she normally sits still until they stop. Plaintiff referenced one specific instance where she experienced a "flasher" attack while driving, which required her to pull over and wait for clarity. She further testified about another vision interruption that causes her to see only half of what she is looking at, such as text or even faces, until she blinks or moves her heard. Plaintiff said this symptom is residual of the stroke and it affects her ability to read. (Tr. 195-98)

Plaintiff testified she has slowed down doing everything since her stroke. She can still drive, but she does not drive alone (usually with her mother) and does not drive very far from home. If she needs to go far, she will call for medical transportation. (Tr. 198-99)

A couple of weeks before the hearing, Plaintiff underwent surgery to repair her left rotator cuff. She had experienced problems with her collar bone since about 2010. Plaintiff believed her shoulder problem began after an incident where she and her mother went into a neighbor's storm cellar during a bad storm and the door hit her. She also suggests her shoulder problems could be the result of a car accident when she was in high school in 1985 or "it's just life . . . my life has got me here." Plaintiff testified that on a scale of one to ten beginning in 2010, her left shoulder pain has been eight or eight-and-a-half continuously. Further, she said she had suffered pain and swelling in her right collar bone area for years. (Tr. 199-201)

Since the prior hearing before a different ALJ, Plaintiff underwent four surgeries for bilateral carpal tunnel repair (two surgeries on each hand). She also experiences trigger thumb release on both hands. Plaintiff is right-handed. She testified her right hand locks up on occasion and she has to wait until it eases up and unfreezes. Plaintiff stated her right arm is much weaker since her stroke, her grip is weaker, and she has pain like pins and needles every day. She takes medication that makes her hand feel cold and numb. Plaintiff thinks the heaviest thing she could lift if a gallon of milk. The pain in her hand causes her difficulty in writing, typing, and cooking. Plaintiff thinks the most she can lift with her left hand is a pound because she primarily uses it to support her right "so together with them both, I can get things done . . . just not as good as I used to be." (Tr. 202-04)

Plaintiff lives alone but her mother lives close by. She has been diagnosed with sleep apnea, which affects her ability to rest at night. Plaintiff uses a continuous positive airway

pressure ("CPAP") machine to help her sleep at night. She testified she recently took part in a study and was recommended she use an oxygen machine, but she did not want to pursue that treatment yet. (Tr. 204-05)

Plaintiff testified about undergoing a discectomy and fusion neck surgery on December 22, 2014. Before the surgery, she had objective abnormalities at multiple levels of her cervical spine. Plaintiff said she continues to have pain and complaints related to her neck despite hoping the surgery would alleviate her problems. She was continuing to receive pain management at the time of the hearing once or twice a month, including injections and other medications. The injections immediately relieve her sciatic nerves, but she said the relief did not last long, usually a couple of weeks if she was lucky. On a scale of one to ten, Plaintiff testified her daily average neck pain is a seven. Certain activities cause her pain to increase, which include sitting too long, washing dishes at a counter for very long, cooking, and generally anything that requires her to be hunched over. (Tr. 205-07)

Plaintiff testified she has sought treatment for Morton's Neuromas and osteoarthritis of her feet. Her left foot is more painful. She was prescribed supports to wear on both feet. Her left ankle separates, which prevents her from putting that foot down until it slowly comes together. (Tr. 207-08)

Plaintiff also has problems with her weight. The morning of the hearing, she weighed 340 pounds. Plaintiff stated her health conditions interfere with her ability to exercise and lose weight. She can stand for only about 10 minutes comfortably before her hips start to burn and she has to move. Plaintiff has difficulty walking for long stretches. For example, she testified she hurts by the time she enters her local Walmart and reaches the back of the store and typically has to sit down on a bench in the middle of the store. Plaintiff testified her hip pain (sacroiliitis)

has bothered her really bad for five years. On a scale of one to ten, she stated her hip pain is a nine. For instance, Plaintiff said that during the hearing she sat half off the chair because her right side sciatic nerve was hurting and getting off of it provided some relief. She said that, at home, she can only sit comfortably for about five minutes before she needs to change positions. Plaintiff testified that one of the activities she does when at home is taking her small dog outside. Because she trained her dog to stay in the yard, she says she normally stays by the door and watches as he relieves himself. (Tr. 208-12)

Plaintiff's counsel asked specific questions related to the physical activities and positions she is capable of doing. Plaintiff said kneeling down would hurt tremendously, principally her hips, neck, knees, and ankles. She said she cannot bend at the waist as it pulls on her spine at the neck. Plaintiff cited a previous yard sale she held and how it shocked her spine to squat and pick things up. If something is on the ground at home, she will sometimes squat to pick it up. Other times, she will sit and pick it up so as not to bend at the waist. Plaintiff also utilizes a grabbing device. If she was on the ground, Plaintiff testified she would need to crawl to find something to pull herself up on. (Tr. 212-13)

Plaintiff testified about her current medications. She initially stated she was not aware of any side effects to her medications. She has been on Gabapentin for a long time. She takes a muscle relaxer, Baclofen, which can make her drowsy. A pain medication also can cause drowsiness, which she conceded was a side effect. Plaintiff testified she needs to take one or two naps during the day, usually once for about an hour-and-a-half and once for about 20 minutes. (Tr. 213-14)

When asked by counsel if she has good days and bad days, Plaintiff responded she had mostly bad days. A good day would consist of her mother coming over for coffee before getting

- 6 -

dressed and going out to a thrift store and walking around. Plaintiff said she has maybe six good days in a month. Most days are bad days because of her pain. During a bad day, she gets up but wants to get back in bed because of the pain. (Tr. 214-15)

Lastly, Plaintiff testified her spine, neck, shoulder, and hip pains would interfere with working a job similar to her prior clerical work experience. (Tr. 215)

A vocational expert ("VE") also testified at the hearing. The VE classified Plaintiff's past work in helping people transporting different types of things as an expediter in the Dictionary of Occupational Titles ("DOT"). Her other job would be classified as a loan clerk under DOT. (Tr. 215-17)

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work history with the following range of light work: lifting 20 pounds occasionally, 10 pounds frequently; standing and walking a total of six hours in eight; sitting total of six hours in eight; no ladders, ropes, or scaffolds; occasional balancing, kneeling, crouching, crawling, stooping, ramps and stairs; no overhead reaching with non-dominant left hand and no overhead pass (due to Plaintiff's neck problems); frequent reaching with non-dominant left in other directions other than overhead; frequent bilateral handling and fingering; and no left-leg controls. The ALJ specifically noted he saw a big difference between, for example, operating a foot pedal on a sewing machine and a leg control that would require range of motion at the ankle, knee, and hip in order to operate like a lever. The VE testified such a hypothetical individual could work as a loan clerk and expediter. The ALJ asked if such a hypothetical individual could perform the work as Plaintiff performed them, but the VE clarified it would be generally as the job titles do not match Plaintiff's past work experience exactly. (Tr. 217-18)

The ALJ asked about a second hypothetical individual who had the same characteristics as the first except for a maximum weight of 10 pounds and standing and walking a total of two hours in eight rather than six. The VE testified such a hypothetical individual could work as an expediter in the national economy. The VE initially said a loan clerk performing as Plaintiff testified during the hearing would be classified as a light job, but he later noted the DOT lists loan clerk as sedentary so could be a possibility for the second hypothetical individual. (Tr. 218)

The ALJ inquired whether both previous hypothetical individuals could perform the same work if they did not kneel, crouch, or crawl at work despite being able to do so at home for personal needs. The VE testified they could still perform those jobs in accordance with DOT definitions. Upon further inquiry from the ALJ, the VE noted loan clerks involve occasional use of hands and expediter requires frequent use of hands. A hypothetical person with the above characteristics and occasional handling could work in the following positions: children's attendant of which there are approximately 50,000 unskilled positions in the national economy; furniture rental consultant of which there are approximately 100,000 light and unskilled positions in the national economy; surveillance system monitor of which there are 8,500 sedentary, unskilled positions in the national economy; and call-out operator of which there are approximately 20,000 sedentary, unskilled positions in the national economy. (Tr. 218-20)

The ALJ asked about customary break periods during work. The VE noted there is normally a break every two hours (15 minutes to a half hour), 45 minutes for lunch, then another break in the next two hours (15 minutes). The VE testified, in his experience, a worker can be off task for any reasons for 10 to 12% of the day. The VE further noted DOT does not account for being off task or missing work. The VE stated he based his opinions on his 35 years' experience as a vocational expert and a variety of resources, including Skill Tran, U.S. Bureau of

Labor Statistics, U.S. Publishing Statistics, and job surveys he has conducted in his work for the U.S. Department of Labor. (Tr. 220-21)

Plaintiff's counsel asked the VE if the jobs he cited were exhaustive or representative. The VE answered they were representative. Plaintiff's counsel asked if a worker who was off task for 20% or more of the day would be fired, to which the VE answered in the affirmative. Plaintiff's counsel asked if a worker with the skill level discussed above would be precluded from all jobs if that worker was off task 20% or more per day. The VE thought yes but noted an employer might allow some latitude in the beginning but the worker may nevertheless lose his or her job if he or she continued to be off task, make mistakes, and require special supervision. Plaintiff's counsel asked if a worker in the jobs cited would be precluded if he or she were to call in late or need to leave work early two or more days per month. The VE said an employer may allow it a couple of times but would probably replace the worker if there needed to be a special accommodation. (Tr. 221)

Plaintiff's counsel also asked the VE about what impact the use of narcotics pain medication throughout the day has on the jobs cited. Specifically, Plaintiff's counsel inquired whether a worker could maintain employment if he or she needed to step away from the work station and lay down to take a nap during the course of the day beyond the scope of the customary 15-minute break as discussed previously. The VE answered such a worker would be precluded from all employment. The VE further noted some studies estimate workers can have three to five absences before being terminated. (Tr. 221-22)

### III. Medical Evidence

Plaintiff claims she is disabled due to symptoms related to a stroke, cervical disc disease with surgery, headaches, visual disturbances, degenerative spine disease of the lumbar and

thoracic spine, left rotator cuff repair, carpal tunnel, arthritis of the hip and left foot and ankle, asthma, obesity, mental health issues including mood disorder and anxiety. Plaintiff explicitly notes in her brief in support of the Complaint that she "basically agrees with the factual findings of the ALJ," but she raises multiple arguments related to the ALJ's consideration or alleged lack of consideration of specific medical evidence and her subjective symptoms. (ECF No. 14, at 1) These specific arguments are addressed fully below, but the Court nonetheless will detail some of Plaintiff's voluminous medical records.

On July 16, 2010, Plaintiff was admitted to the emergency room at Missouri Southern Healthcare and was assessed with heat exhaustion and dehydration. (Tr. 924-25) A few days later, she was an inpatient at Poplar Bluff Regional Medical Center where a CT scan revealed she had suffered a left cerebrovascular accident and hemianopsia. (Tr. 894) Another CT scan of Plaintiff's brain on May 24, 2013 was largely unremarkable, and it found no subdural hematoma or intracranial hemorrhage, no mass or shift of midline structures, no areas of decreased attenuation which indicated acute cerebrovascular accident. That CT scan did show some subtle decreased attenuation or encephalomalacia in the left occipital lobe and ventricles appeared normal. (Tr. 770-71).

Dr. Shahid Choudhary, M.D., examined Plaintiff in January 2013. Among other things, Dr. Choudhary noted Plaintiff complained of having headaches for quite some time since her stroke in 2010. Dr. Choudhary believed Plaintiff may possibly have mixed migraine as well as tension headaches. Additionally, Dr. Choudhary suggested the possibility of rebound headaches related to her pain medications. (Tr. 618-19)

Dr. Steven Mellies, D.O., examined Plaintiff in August of 2013. He noted Plaintiff's stroke in July of 2010 was most likely a posterior-circulation stroke and had been attributed to

- 10 -

dissection of a vertebral artery. He further believed there was some involvement of the left occipital lobe. Dr. Mellies commented on Plaintiff's continued visual disturbance to the right side and noted that some of this might be from residual stroke or because of her migraines. (Tr. 817-19)

A CT scan of Plaintiff's brain in September 2013 showed there was suggestion of a subtle area of asymmetric diminished density seen in the left occipital lobe region adjacent to the left occipital horn. Dr. Robert Seeling, M.D. noted this could be related to some subtle chronic ischemic changes of this area appearing somewhat more evident on the present than the prior study. Overall, Dr. Seeling wrote there were no acute changes suggested at the present time. Specifically there was no evidence for acute infarction, evidence of hemorrhage, midline shift nor cerebral edema. (Tr. 721)

Plaintiff had x-rays done of her cervical spine in February 2013. These x-rays showed no acute osseous abnormality through the superior endplate of C7. She had degenerative disc disease at the C5-C6 and C6-C7, and C4-C5 levels. Additionally, there was straightening of the normal cervical lordosis that could be seen with muscle spasm. (Tr. 723-24) An MRI of Plaintiff's cervical spine performed on October 1, 2013 showed a tiny central disc bulge or protrusion C2-3; mild central to right-sided protrusion C3-4; broad-based prominent central protrusion especially C5-6; central to right-sided protrusion C6-7; multilevel stenosis, especially at C5-6, 5.5 millimeters, and C6-7, 5.4 millimeters; and multilevel neural foraminal narrowing, including bilateral neural foramina at C5-6, C6-7, and C7-T1. (Tr. 719-20) A June 2015 x-ray showed a successful anterior cervical fusion. (Tr. 1486)

Plaintiff also had x-rays performed of her thoracic spine in February 2013, which showed

multilevel chronic degenerative change with no acute osseous abnormality. (Tr. 725) In March 2014, Dr. Mellies examined Plaintiff for pain in her mid to low thoracic region with alleged development of numbness and tingling of her feet when she is standing. Dr. Mellies noted Plaintiff's pain may be a sensory level at this level, but he did not see any signs of myelopathy on examination or any signs of cervical radiculopathy or lumbar radiculopathy. (Tr. 820-21)

Dr. Brandon Scott, D.O., examined Plaintiff in October 2014. He noted she weighed 315 pounds, which is morbidly obese. Dr. Scott further described Plaintiff as well developed, well nourished, well groomed, in no apparent distress. Her gait and station were normal. She was able to walk on her heels with difficulty, walk on her toes without difficulty, and tandem walk without difficulty. Plaintiff had no laxity or subluxation of any joints. Her spine had limited active range of motion with extension. She had full passive range of movement. Her coordination/cerebellar function were normal. Plaintiff's recent and remote memory were intact. Her attention was intact. Her muscle strength was normal. Dr. Scott ultimately diagnosed with degenerative disc disease of the cervical spine. (Tr. 1063-64) Dr. Scott later examined Plaintiff during a follow-up examination in February 2015 wherein Dr. Scott noted, among other things, Plaintiff's weight remained stable. Plaintiff further reported a daily pain level of seven out of ten. (Tr. 1075-79)

In September 2015, x-rays of Plaintiff's left ankle and foot showed osteoarthritis. (Tr. 1342-64)

## IV. The ALJ's Determination

In a decision dated August 2, 2016, the ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2014. Plaintiff had not engaged in substantial gainful activity since April 26, 2013, the amended alleged onset date. The ALJ further found

- 12 -

that Plaintiff had the following severe impairments: a history of left occipital infarct/vertebral artery dissection resolved, migraine headaches, visual disturbances, degenerative disc disease of the cervical spine with surgery, carpal tunnel syndrome and trigger fingers with surgery, degenerative disc disease of the lumbar and thoracic spine, degenerative joint disease of the left shoulder with surgery, osteoarthritis of the left ankle and foot, mild osteoarthritis of the left hip, asthma and obesity. The ALJ also found Plaintiff had the following medically determinable impairments that were either non-severe or that did not persist 12 continuous months: candidiasis, a urinary tract infection, menorrhagia with a total hysterectomy, gastroesophageal reflux disorder, and onychomycosis. Further, Plaintiff's alleged adjustment disorder, personality disorder, and panic disorder without agoraphobia were medically determinable mental impairments. However, the ALJ concluded they did not cause more than a minimal limitation in Plaintiff's ability to perform basic mental work activities and were, therefore, non-severe.[2] While Plaintiff did have severe impairments, the ALJ concluded she did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13-18)

After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of light work. These limitations include lifting and or carry 20 pounds occasionally and ten pounds frequently; standing and/or walking a total of six hours out of an eight-hour workday; sitting for a total of six hours out of an eight-hour workday; not climbing ladders, ropes and scaffolds; occasionally balancing, stooping, and climbing ramps and stairs; not kneeling, crouching, or crawling except at home for personal

---

[2] The ALJ specifically noted Plaintiff had never been hospitalized for mental illness. She also never received counseling for mental illness, although her primary care physician who treats her physical impairments has also treated her for mental illness. Further, Plaintiff did not describe severe symptoms related to adjustment disorder, personality disorder, and panic disorder without agoraphobia in her testimony at the hearing on May 17, 2016. (Tr. 14)

needs; no overhead reaching and/or tasks with the nondominant left upper extremity but can frequently reach in other directions; frequently handle and finger bilaterally; and not using left leg controls (although she can operate left foot pedals). In making this finding, the ALJ disregarded the VE's negative response to plaintiff's counsel's inquiry if any jobs would be available if Plaintiff were off task at work more than 20% because the weight of the evidence does not support such a limitation. Similarly, the ALJ disregarded the VE's negative response to plaintiff's counsel's inquiry regarding Plaintiff potentially calling in late to work, leaving work early two or more days per month, or needing to step away from her work station and take a nap beyond the two 15-minute breaks provided by the work force. Based on the VE's testimony and in consideration of Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. Therefore, the ALJ concluded that Plaintiff had not been under a disability from April 26, 2013 through the date of the decision and was not disabled. (Tr. 18-26)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe physical or

mental impairment or combination of impairments which meets the duration requirement; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

- 15 -

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.*

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[3] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

In her brief in support of the Complaint, Plaintiff explicitly notes she "basically agrees with the factual findings of the ALJ." (ECF No. 14, at 1) Nevertheless, she raises three arguments. First, Plaintiff argues the ALJ's hypothetical questions that properly evaluated her condition call for a finding of disabled. Second, Plaintiff argues the ALJ's RFC determination is not supported by the substantial evidence because it does not contain any reference to psychiatric limitations. And third, Plaintiff argues the ALJ erred under SSR 16-3p because he did not

---

[3] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner*, 646 F.3d at 558 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

consider her written statements contained in the record and did not clearly articulate his reasons for discounting the claimant's symptoms. Defendant responds that the ALJ properly evaluated the record, including Plaintiff's subjective symptoms. Defendant further contends the RFC determination is supported by substantial evidence and Plaintiff's additional evidence submitted after the ALJ issued his decision cannot be considered. Finally, Defendant argues that the ALJ properly assessed Plaintiff's subjective claims and that Plaintiff has not shown why her past written statements should be given more deference than her oral testimony at the hearing.

### *(a)    The ALJ's hypothetical questions*

Plaintiff argues the evidence in the record demonstrates she is unable to perform light duty work. She says her testimony and diary entries show she cannot stand for the required amount of time to perform light duty work. Further, Plaintiff states her headaches[4] and "flashers" would cause her to be absent or off task for a significant amount of time, which would preclude employment as confirmed by the VE. Specifically, Plaintiff cites the following language from the ALJ's decision:

> Medical evidence shows that the claimant's migraines are not a stroke residual (Exhibit B5F). Dr. Choudhary said her migraines were possibly just rebound headaches (from taking too many NSAIDs or narcotics). The claimant complained of a headache on August 20, 2013, May 10, 2011, May 24, 2013, August 20, 2013 and on September 24, 2013 classified as an atypical migraine. That was all the headache treatment in the totality of the record (Exhibit B7F, B16F, and B17F).

(Tr. 21) Plaintiff argues the ALJ's statement regarding her history of treatment for headaches is incorrect. She suggests Dr. Choudhary's statement was taken out of context as the evaluation form says Plaintiff may have "mixed migraine as well as tension headaches." (Tr. 619) Additionally, Plaintiff cites to 32 instances in the record that note treatment, diagnosis, or past

---

[4] Plaintiff uses the term "headaches" and "migraines" interchangeably throughout the record, including the transcript of the hearing before the ALJ and her brief.

diagnosis of headaches or migraines: Tr. 663, 670, 674, 678, 728, 729, 767, 839, 840, 843, 855, 833, 899, 943, 960, 998, 1004, 1008, 1012, 1020, 1024, 1028, 1032, 1036, 1039, 1043, 1053, 1054, 1065, 1075, 1085, 1119.[5] Plaintiff further argues her weight, degenerative spine disease, and hip and foot problems make her unable to stand for six hours during a workday and necessitate her lying down periodically. She suggests her severe pain would cause excessive absences from work, which the VE confirmed would lead to termination.

None of the listed records cited by Plaintiff support her argument. For example, several of the documents Plaintiff cites relate to the specific dates the ALJ noted as instances where she complained of headaches. (Tr. 767, 855, 943) Most of the documents cited by Plaintiff principally relate to examinations concerning her neck and/or back pain although they mention her history of headaches. (Tr. 663, 670, 674, 678, 998, 1004, 1008, 1012, 1020, 1024, 1032, 1036, 1039, 1043, 1053, 1065, 1075) However, as Defendant notes, these are consistent with the ALJ's characterization of a lack of headache *treatment* rather than records that merely mention the fact that Plaintiff has experienced headaches. Only one record cited by Plaintiff directly makes a connection between her back and neck pain "causing headaches." (Tr. 1119) Other records do not mention headaches or migraines at all. (Tr. 833, 899, 960, 1054, 1085) Lastly, one document is an eye examination that notes Plaintiff gets headaches after she experiences a "flasher." (Tr. 839) However, this eye examination directly contradicts other evidence that did not link Plaintiff's visual disturbances with migraines. For example, another document Plaintiff cites (Tr. 728) is an exact copy of the August 8, 2013 evaluation by Dr. Mellies, which not only was explicitly discussed by the ALJ but also notes Plaintiff said her migraines were not associated with her reported visual disturbances/"flashers" (Tr. 817).

---

[5] Plaintiff suggests the record contains more related instances "[i]f neck pain is also considered headaches." (ECF No. 14, at 6)

Plaintiff correctly notes the ALJ, in making a determination that she is not disabled, disregarded the VE's suggestion that a hypothetical individual who needed as many breaks or allowed absences as her would be precluded from employment. The ALJ explained his reasoning that the weight of the all the evidence – including Plaintiff's subjective testimony and medical evidence – did not support such a limitation to the extent Plaintiff claimed. The Court finds that substantial evidence supports the ALJ's conclusion regarding the severity of Plaintiff's impairments. *See Buckner*, 646 F.3d at 556. Furthermore, the 32 instances in the record Plaintiff cites are insufficient to overrule the ALJ's determination. The Court will not disturb the ALJ's decision simply because another conclusion could be drawn had another fact finder given more weight to Plaintiff's subjective symptoms. *See Young*, 221 F.3d at 1068.

### *(b)*    *Plaintiff's RFC determination with regard to alleged psychiatric limitations*

Plaintiff next argues the ALJ's RFC determination is not supported by competent and substantial evidence because it did not include any mental health considerations.

Plaintiff's initial broad assertion is not supported by the ALJ's decision. The ALJ noted Plaintiff claimed disability due to adjustment disorder, personality disorder, and panic disorder without agoraphobia. In making his determination, the ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1. With regard to the first functional area of activities of daily living, the ALJ describes the many activities Plaintiff is capable of doing. These include her abilities to maintain her own hygiene without assistance, take care of her daughter and small dog, and drive and use public transportation. Further, Plaintiff handles her own money and has said this ability has not changed since her impairments began. (Tr. 14; 394-402) With regard to the second functional area of social

functioning, the ALJ notes Plaintiff does not have an problems getting along with family, friends, or neighbors and is able to function in public places, including the grocery store and medical facilities. With regard to the third functional area of concentration, persistence, or pace, the ALJ found that Plaintiff can concentrate long enough to manage her finances, prepare meals, and watch movies. Finally, the ALJ found Plaintiff has never experienced an episode of decompensation to satisfy the fourth functional area. Based on the above analysis, the ALJ found that "[Plaintiff's] medically determinable mental impairments" are non-severe because such impairments "cause no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area." (Tr. 14-15)

Plaintiff argues that, even assuming the ALJ's determination that her mental impairments are non-severe, the descriptions for expediter and loan clerk as found in the DOT require a high level of ability to correspond with the public and even mild mental limitations would preclude this job. She cites to SSR 85-15, which, among other things, discusses how varying levels of stress in a work environment can impact someone who is mentally impaired. However, as Defendant correctly notes, the ALJ specifically found that Plaintiff is not mentally impaired. Therefore, SSR 85-15 is inapplicable.

Additionally, Plaintiff complains the ALJ's RFC determination did not consider records from the Kneibert Clinic dated August 23 through November 18, 2016. (Tr. 99-125) These records were not part of the record in front of the ALJ before he issued his decision on August 2, 2016. Plaintiff nonetheless presented these records to the Appeals Council. The Appeals Council did not consider the Kneibert Clinic records when declining to review the ALJ's decision and explained "[t]his additional evidence does not relate to the time period at issue.

- 20 -

Therefore, it does not affect the decision about whether [Plaintiff was] disabled beginning on or before August 2, 2016." (Tr. 2)

Judicial review of a Social Security disability claim is limited to the evidence found in the certified administrative record. *See* 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). "In the context of judicial review of a decision of the Commissioner regarding SSI disability benefits, evidence outside the administrative record generally is precluded from consideration by the court." *Baker v. Barnhart*, 457 F.3d 882, 891 (8th Cir. 2006). If a claimant presents new evidence related to his or her claims, a court may remand the case to the Commissioner. "Remand is appropriate only upon a showing by the claimant 'that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997) (quoting 42 U.S.C. § 405(g)).

Plaintiff has not formally requested the Court remand her case to the Commissioner. Further, she has not shown that the new evidence is material to the ALJ's decision. "To be considered material, the new evidence must be 'non-cumulative, relevant, and probative of the claimant's condition *for the time period for which benefits were denied*.'" *Id.* (emphasis added) (quoting *Woolf v. Shalala*, 3 F.3d 1210, 1215 (8th Cir. 1993)). The evidence Plaintiff presents are from her treatment at the Kneibert Clinic that began three weeks after the ALJ issued his decision. She has not offered a persuasive reason to believe that any diagnosis at the Kneibert Clinic related to her condition during the relevant time period for the ALJ's decision and this

- 21 -

subsequent judicial review or that any such diagnosis would alter the ALJ's RFC determination.[6] As the Appeals Council indicated in its September 19, 2017 Notice: "If you want us to consider whether you were disabled after August 2, 2016, you need to apply [for SSI] again." (Tr. 2)

"Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (quoting *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007)). The record shows that the ALJ properly considered the medical evidence presented at the time and based the RFC determination on all of the evidence contained in the record, which included Plaintiff's in-person testimony about her subjective symptoms. Furthermore, Plaintiff has failed to demonstrate the additional evidence Plaintiff offered to the Appeals Council relates to her condition during the relevant time period. Thus, the Court finds that substantial evidence supports the ALJ's RFC determination. *See id.* (finding that claimant has burden of establishing RFC; while RFC assessment draws from medical sources for support and must be supported by some medical evidence, it is ultimately administrative determination reserved to Commissioner).

### *(c)  Impact of Plaintiff's written statements concerning her symptoms*

Plaintiff next argues the ALJ "did not consider and discuss the detailed diary evidence of the claimant's symptoms." (ECF No. 14, at 11) Specifically, she argues the ALJ failed to comply with SSR 16-3p by not discussing her diary entries in his decision.

---

[6] The records from the Kneibert Clinic reflect Plaintiff was diagnosed with mood disorder, anxiety, and cannabis abuse with a Global Assessment of Functioning ("GAF") score of 45-48 when she began treatment. (Tr. 116) Defendant notes that while the GAF scale is used by some clinicians to measure a patient's level of psychological, social, and occupational functioning, it is not necessarily an assessment of an individual's ability to work. Specifically, the Commissioner has declined to endorse the GAF scale for use in Social Security and SSI disability programs and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (August 21, 2000). *See Lawson v. Colvin*, 807 F.3d 962, 966 (8th Cir. 2015) (finding it would be proper for an ALJ to give little weight to low GAF score if it is inconsistent with totality of medical evidence and not supported by claimant's demonstrated level of functioning).

The Social Security Administration has mandated that "adjudicators must base their findings solely on the evidence in the case record, *including any testimony from the individual or other witnesses at a hearing before an administrative law judge or hearing officer*." SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). The ALJ plainly considered Plaintiff's testimony from the hearing and discussed her subjective symptoms at great length in his decision. (Tr. 19-20) Plaintiff has not offered a persuasive reason why her diary entries should outweigh her own testimony during the hearing during which, as the ALJ notes, she "did not describe severe symptoms related to adjustment disorder, personality disorder and panic disorder without agoraphobia." (Tr. 14)

The Court finds that the ALJ properly considered all the evidence in the record before him, which included Plaintiff's in-person testimony during the hearing about her subjective symptoms as required by SSR 16-3p. "As is often true in disability cases, the question [is] not whether [Plaintiff] was experiencing pain, but rather the severity of her pain." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). "An ALJ has a statutory duty to assess the credibility of the claimant, and thus, an ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances." *Crawford v. Colvin*, 809 F.3d 404, 410 (8th Cir. 2015) (internal quotation marks omitted) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 589-90 (8th Cir. 2004)). The Court finds that substantial evidence supports the ALJ's determination that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 20)

Furthermore, the fact that the ALJ's decision does not address Plaintiff's submitted diary entries does not merit reversal. The Eighth Circuit has held that "an ALJ is not required to

discuss every piece of evidence submitted" and "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (alteration in original) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). Therefore, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff was not disabled under the Social Security Act and affirms the decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits is **AFFIRMED**. An appropriate Judgment shall accompany this Memorandum and Order.

Dated this *18th* day of March, 2019.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**